## JOHN BUIE *v.* HENRY PARKER.

Where a man, at that time a slave, on the 15th of March 1865 took possession of a mule abandoned as unserviceable by General Sherman's army which two days before had occupied that part of the State, *Held,* that the finder's owner, who upon the 12th of March had " deserted" him, acquired no title to such mule, as against him.

The Act of Congress of 1862, ch. 19, § 9, (July 17th) is not unconstitutional,—the United States and the Confederate States having been at that time " belligerents."

In cases of parol gifts of slaves under our former laws, the title to the slave *vested in the donee* subject to be divested, and did not remain in the donor.

Discussion, *by* PEARSON, C. J., of the rights of the owners of slaves to things found by the latter; also of the peculiar and contingent condition of slaves in North Carolina between the period of military occupation by the army of the United States, and that of the passage of the Ordinance of Emancipation.

(*Ex parte Hughes,* Phil. 57, and *Cook* v. *Cook, Ib.* 583, cited and approved.)

(Practice under the Code of Civil Procedure.)

COMPLAINT for the recovery of a mule, accompanied by claim and delivery, tried by his Honor *Buxton, J.*, (trial by jury having been waived) at Fall.Term 1868 of the Superior Court of CUMBERLAND.

The facts, as found by his Honor, were that the defendant, formerly the slave of one McEachin (still living) was in 1857 by him given by verbal gift to his daughter, the wife of the plaintiff, and subsequently remained in possession of the plaintiff up to the time when General Sherman's army entered the county, in March 1865; the day before Sherman entered Fayetteville (13th of March 1865) the plaintiff, who had aided the Confederate cause, as he was leaving home for safety told his slaves that they could go to " the Yankees," or stay at home, as they pleased. The defendant stayed, and continued with the plaintiff for some months, as formerly, but during the latter. part of this year he was put upon wages, and continued as a hired servant for a year or so ; the mule in dispute was one of Sherman's abandoned stock, and was picked up by the defendant on the 15th of March, 1865, and was by him, on the plaintiff's return home turned into plaintiff's horse lot, he telling the plaintiff's wife, who expressed a wish for the mule, that he desired to retain it to make a crop with. The mule was worked in the plaintiff's wagon, part of the time by Henry himself, and was fed and kept with plaintiff's stock. Both parties claimed it. The plaintiff offered to pay the defendant for taking it up, but the defendant declined to receive it and insisted on his right to it. During the latter part of 1865 the defendant spoke of placing the mule with another person for its feed, but the plaintiff declined to let it go; in July 1868 the defendant got possession of the mule by the intervention of the Military. The plaintiff recovered possession, by means of the process in this action, on the 18th of October 1868. The value of the mule is $150.00, and it would hire for 50 cents per day.

*Upon these facts*, his Honor was of opinion that as between these parties, natural justice favored the defendant, and that,

if he were a slave when the mule was found, his finding it enured to the benefit of *his owner*—who was McEachin, and not the defendant. (Rev. Code, ch. 50, s 12.)   Therefore as McEachin had not intervened, the defendant was entitled.

As another view, his Honor considered that the defendant was liberated by the declaration of the plaintiff, that he might go to "the Yankees;" that his subsequent remaining with the plaintiff did not affect this liberation, and so, that when afterwards he found the mule, he was entitled to all the rights of a finder.

From the judgment thereupon rendered in favor of the defendant, the plaintiff appealed.

*B. Fuller* and *Merrimon* for the appellant.

The defendant was a slave until the ordinance of October 1865.   *State* v. *Brodnax*, Phil. 41, *Woodfin* v. *Sluder, Ib.* 200; *Chandler* v. *Holland, Ib.* 598.

Before emancipation he could not acquire or hold property. *White* v. *Cline*, 7 Jon. 174 ; *Love* v. *Brindle, Ib.* 560; *Glasgow* v. *Flowers*, 1 Hay. 122; *Heathcock* v. *Pennington*, 11 Ire. 640.

If plaintiff were not the general owner, he was the person entitled to the casual profits arising from acts of the slave whilst his; or at least has right enough as bailee to maintain this action. *Armory* v. *Delamirie*, 1 Sm. L. C. 151; *Freshwater* v. *Nichols*, 7 Ire. 251, *Scott* v. *Elliott*, Phil. 104.

The Federal Act of 1862 cannot affect this question.   It is unconstitutional, except as an act of the war-making power, and at most does not extend to cases like this.

*Hinsdale, contra.*

PEARSON, C. J.   Slavery no longer exists in North Carolina:—so the questions of law presented by this case, are not of importance, in a general point of view, and the interest in our decision is confined, in a great measure, to the parties to this action; for, it is hardly to be presumed that other cases, involving like principles of law, will again occur

The case, however, has some additional interest, because it

is the first that has been brought before us, where the proceedings and trial were had under the " Code of Civil Procedure."
. . A trial of the issues of fact by a jury was waived, and his Honor, the presiding Judge, has set out the facts found by him,—so the case comes up, as upon a special verdict, and the general question is presented, Upon the facts found is the plaintiff or defendant entitled to judgment?

His Honor was of opinion with the defendant. In that opinion we concur, and the judgment will be affirmed; although we do not concur in several of the positions assumed in the train of reasoning, by which he arrived at that conclusion.

For instance—his Honor expresses the opinion that on a parol gift of a slave to a child, the donor is to be deemed the owner, and is entitled to all of the incidents of ownership. We are of the opinion that the donee is the owner, subject to the right of the donor to treat the gift as a nullity, by act in his lifetime, or by his will—but until the gift is thus avoided, the donee is entitled to the services of the slave, to his control and management, and to all of the incidents of ownership.

Again, his Honor expressed the opinion that, as a slave has no capacity, either to acquire or hold property, as soon as he takes possession of property lost or abandoned, the right growing out of occupancy or possession is, by law, vested in his owner. We are of opinion that no right is acquired by the owner of the slave, until he makes claim and takes possession. In other words, we think, if a slave catches a 'coon, or other animal *feræ naturæ*, or if he finds a pocket-book, or " picks up " an abandoned mule, and passes the thing to a third person before his owner takes it into possession, the third person is entitled by occupancy, and the owner of the slave has no cause of action; for the instrumentality of the slave, a mere chattel, has no legal effect, and the incapacity of a slave to acquire property, is not an incident of ownership, but a rule founded on public policy in respect to slavery.

This last principle, however, does not bear upon our case, for the defendant, after "picking up" the mule, put it into the stable yard of the plaintiff, who we assume to be his owner.

And there is not the least doubt, that, if this had occurred before the war, the plaintiff would have been entitled, by pounding under the stray-laws, to make himself the owner of the mule. But "*inter arma leges silent,*" and the question is, in the absence of a claim on the part of the true owner, upon the facts found, does the law put the title of the mule in the plaintiff, or in the defendant; taking into consideration the condition of the country at the time when the defendant took possession of the mule, and the change which had then taken place in the social relation of owner and slave in the County of Cumberland, where the parties resided, by reason of the procla-mation of the President, and of the Act of Congress, of July 1862, and the movements of General Sherman's army.

Passing by the proclamation, the act of Congress, 17th July, 1862, ch. 195, sec. 9, enacts: " The slaves of persons who shall hereafter give aid to the rebellion, taking refuge within the lines of the army"—and " all slaves captured from such persons, or *deserted by them*, and coming under the control of the government of the United States,—and all slaves of such persons found or being within any place occupied by rebel forces, and afterwards occupied by the forces of the United States, shall be deemed captives of war, and shall be forever free of their servitude and not again held as slaves." Does this act apply to our case? Look at the facts found. The plaintiff did give aid to the rebellion,—on the 12th of March, 1865, he *deserted his slaves*, that is, he told them " they could go to the Yankees, or stay at home, as they pleased," and he sought safety by flight. On the 13th of March, Sherman's army entered Fayetteville, and so the defendant, as a slave of the plaintiff, came under the control of the government of the United States. On the 15th of March, the defendant " picks up " the mule, and puts it in the stable-yard of the plaintiff. His Honor, in the second view which he takes of the case, expresses the opinion, that " the defendant was then a free man." It is not necessary to go so far, in order to support the conclusion of law in favor of the defendant's right to judgment. We prefer to adjudge that his status as slave or freeman was conditional,

and dependent upon the result of the war. In this state of uncertainty, had the plaintiff made an *express* promise to pay wages to the defendant for future services, we should be inclined to the opinion, that the plaintiff would have been bound by the undertaking, although the fact of freedom may not have been accomplished until the passage of the ordinance of emancipation; but in the absence of an express promise, we should incline to the opinion, that the law would not imply a promise to pay wages—on the ground that the parties had concluded that it was better for both sides, to go on as they had done before, until the uncertainty in regard to their social relation was settled. So, if the defendant had unconditionally put the mule into the possession of the plaintiff, and waived all claim, we should have inclined to the opinion, although his freedom was afterwards fully recognized and confirmed, still he would not have had a right to set up a claim expressly waived, and to invoke the doctrine of relation by act of law. But, in our case, so far from waiving his right, the defendant at the outset asserted it, and has insisted upon it ever since, and the possession, from mutual considerations of prudence and forbearance, was held in common; both parties reserving their rights, and leaving the result to depend upon future contingencies—that is, if the Confederate States was successful, both the defendant and the mule would be the property of the plaintiff—if the United States prevailed, the defendant was a freeman, and the mule was his property. Accordingly, when the plaintiff, notwithstanding the result of the war, set up a claim to the exclusive possession of the mule, the defendant invoked the aid of "the military," We lay no stress upon this act of the military, (as it is called, in the facts found by his Honor,) because the reference is so vague that no legal effect can be given to it.

On the part of the plaintiff it was insisted, that the act of Congress is unconstitutional. For that the government of the United States has no power to interfere with the domestic concerns of a State in the Union. The reply is: The State of North Carolina was then in rebellion. The United States and the Confederate States were belligerent powers, and, by

the law of nations, a belligerent party is justified in resorting to any measure to strengthen itself or weaken its adversary. This is well settled. See *Vattel.*

The notion, that, although North Carolina was in rebellion, yet, inasmuch as she was a State in the Union, the general government had not a right " to hit her as hard " as if she had been a foreign nation at war, we consider fully disposed of by the cases *Ex parte Hughes,* Phil. 57, and *Cook* v. *Cook, Ib.* 583. "' Fratricide is a more heinous crime than the killing of one with whom there is no tie of kindred." A State in rebellion surely can not claim to be exempted from the law of nations applicable to a foreign power waging war.

There is no error.

PER CURIAM.	Judgment affirmed.